IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TANGELA N. MOSLEY,

    Plaintiff,

vs.                                    CASE NO.: 4:06cv366-SPM/WCS

CAPITAL HEALTH CARE
ASSOCIATES d/b/a CAPITAL
HEALTHCARE CENTER,

    Defendant.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This cause comes before the Court on Defendant's motion for summary judgment (doc. 33). The parties have had the opportunity to fully brief the issues and to submit materials in accordance with Northern District of Florida Local Rules 56 and 7.1. For the reasons explained below, the Court finds that Defendant is entitled to judgment as a matter of law.

**I.    BACKGROUND**[1]

This is a suit for employment discrimination based on race and disability. Plaintiff Tangela Mosley is African-American. She began working at Capital

---

[1] The facts are presented for purposes of summary judgment in the light most favorable to Plaintiff. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999)

Healthcare Center in 1991 as a full-time Certified Nursing Aid (CNA). As a CNA at Captial Healthcare Center, Ms. Mosley lifted and repositioned patients, assisted with patient baths and meals, and provided general patient care. When Ms. Mosley started, Capital Healthcare Center was owned by Beverly Enterprises. Throughout her tenure, management changed to Sea Crest and then to Capital Health Care Associates.

In 1996, while still owned by Beverly, Ms. Mosley suffered a workplace back injury that led to a permanent 35-pound lifting restriction. The restriction prevented Ms. Mosley from continuing to work as a regular CNA. As an accommodation to Ms. Mosley, Beverly assigned Ms. Mosley to a Staffing Coordinator position.

As the Staffing Coordinator, Ms. Mosley occasionally performed CNA duties that did not require heavy lifting, such as passing out food, taking vital signs, and assisting patients with grooming. When needed, she also answered the telephone in the front office, filed medical records, made appointments for employees who were being deposed for lawsuits, made copies of employee files, and conducted tours of the facility for potential patients and their families.

Primarily, however, Ms. Mosley's job was to coordinate staffing. She was responsible for making the monthly schedule for the CNAs, which was posted at least 10 days before the end of the month so that the CNAs could know in advance their schedules for the next month. In making the schedules, Ms.

Mosley considered requests for time off submitted by the CNAs.

Ms. Mosley was also responsible for writing out the daily schedule for CNAs based on the monthly schedule that she made. She was also responsible for writing out the daily schedule for the Registered Nurses (RNs) and the Licensed Practical Nurses (LPNs) from the monthly schedule that the Staff Development Coordinator made.

As the Staffing Coordinator, Ms. Mosley collected information from the payroll clerk and provided the information to the Administrator, Paul Kovary, so that he could prepare daily allocation reports and summary reports. The allocation reports set forth the number of staffing hours allocated for a 24-hour period. The summary reports show the total number of hours worked by all employees for a 24-hour period.

As the Staffing Coordinator, Ms. Mosley was responsible for making sure that the facility was properly staffed. The facility can admit up to 156 patients and has three wings. The facility was required to meet state regulations that called for 2.60 CNA hours of care time and 1.0 RN or LPN hours of care time for each patient per day (ppd). The facility was considered understaffed if the ppd fell below the requirements. The facility was considered overstaffed if the ppd for CNAs exceeded 2.66 and exceeded 1.1 for RNs and LPNs.

Ms. Mosley was instructed to overstaff the facility on weekends, holidays, and during times that the Agency for Health Care Administration came to the

facility for annual inspections. In these situations, if all of the employees scheduled on a shift showed up for work, the employees who were not needed to meet minimum staffing requirements were sent home. If less than the necessary staff showed up for work, Ms. Mosley would attempt to find coverage by calling employees who volunteered to work. If there were no volunteers, Ms. Mosley would call other employees to get coverage.

Although Ms. Mosley's job was difficult, during the five years that she was the Staffing Coordinator under Beverly, she received all favorable job evaluations. In October 2001, Sea Crest Health Care Management (Sea Crest) took over management of the facility. Sea Crest retained all of the Beverly employees, including Ms. Mosley, who continued as the Staffing Coordinator. As a formality, Ms. Mosley filled out an application with Sea Crest. She indicated "Nursing Secretary" as her first job choice. It is the same position as the Staffing Coordinator. As her second choice, Ms. Mosley listed CNA because she had been performing CNA duties, without lifting, when needed under Beverly. Ms. Mosley continued performing these CNA duties, without lifting, under Sea Crest on an as-needed basis.

The Director of Nursing under Sea Crest from April 2002 to November 2004 was Bernadine Boyd. Ms. Mosley, as the Staffing Coordinator, reported to Ms. Boyd. She continued to report to the Administrator, Mr. Kovary, as well. Under Sea Crest, Ms. Mosley received only positive feedback on her job

performance.

According to Ms. Boyd, however, on more than one occasion Ms. Mosley scheduled the same employee to work on all three wings at the same time, which caused two of the wings to be understaffed.  On more than one occasion, the daily schedule did not match the monthly schedule.  This caused employees to be confused about when they were scheduled to work.  Ms. Boyd also stated that she received complaints that Ms. Mosley was unfriendly to nursing staff when they submitted their requests for time off.  As a result of these problems, Ms. Boyd recommended to Mr. Kovary that Ms. Mosley be transferred from the Staffing Coordinator position.  Ms. Boyd believed that Ms. Mosley could not handle the position.  Mr. Kovary did not transfer Ms. Mosley.  He did not even speak with Ms. Mosley about these issues; nor did Ms. Boyd.

In June 2004, Capital Health Care Associates (Capital) took over the facility.  As a formality, Ms. Mosley filled out an employment application.  She listed CNA as her desired position, and Staffing Coordinator as her first choice.  Ms. Mosley explains that the Staff Development Coordinator, Mary Scileppi, told Ms. Mosley that there was no written job description for the Staffing Coordinator position and Ms. Mosley believed that she was still technically classified as a CNA.

Under Capital, Ms. Mosley remained in the Staffing Coordinator position and continued to perform the same duties.  In September 2004, her duties

expanded.  In addition to gathering information from payroll, she was now required to prepare the allocation and summary reports.

On November 5, 2004, Mr. Kovary and Ms. Boyd were terminated for covering up the fact that the facility was understaffed.  They asked CNAs to sign time adjustment sheets to show they had worked hours, which in fact they had not worked.  Capital launched an investigation which revealed that the facility was frequently understaffed and that Mr. Kovary and Ms. Boyd were falsifying CNA records to hide this fact.

The Agency for Health Care Administration issued the facility a citation for failure to meet the minimum staffing requirements.  To remove the citation, Capital had to demonstrate during the next agency visit that the minimum staffing requirements were being met consistently.  Capital placed a greater focus on staffing as a result.

In November 2005, Captial hired Sharon Colbert as the Interim Administrator and Patty Barrett as the Interim Director of Nursing.  To ensure that minimum staffing requirements were met, Ms. Colbert and Ms. Barrett worked closely with Ms. Mosley.  According to Ms. Colbert and Ms. Barrett, they immediately recognized that Ms. Mosley had difficulty calculating the ppds and preparing accurate documentation.  According to Ms. Mosley, however, she did not receive any negative feedback, nor was she given any consultation about her work performance until January 3, 2005, as reflected in her personnel file.

On January 3, 2005, Ms. Colbert gave Ms. Mosley a Level One Coaching Plan stating that the "documentation and records" that she was responsible for had to be "complete and accurate." Ms. Colbert met with Ms. Mosley and expressed concerns about the failure of the allocation reports to match the daily schedules. Ms. Mosley explained to Ms. Colbert that she received the information for the allocation reports from payroll, and Ms. Mosley had no control over the accuracy of the payroll information. Ms. Colbert acknowledged the problem and told Ms. Mosley that she would review the schedules and the allocation reports with Ms. Mosley so that they could figure out why payroll's numbers and Ms. Mosley's numbers were not matching. Ms. Colbert did not meet with Ms. Mosley again, however, and the issue was never resolved.

Another matter Ms. Colbert discussed with Ms. Mosley was the discrepancy between the monthly schedule and the daily schedule. Ms. Mosley acknowledged the problem, but noted that it was very infrequent.

Between January 3, 2005, and February 24, 2005, neither Ms. Colbert nor Ms. Barrett talked to Ms. Mosley about performance issues. In February 2005, Joyce Denham was hired as the new Administrator of the facility. On February 24, 2005, Ms. Denham and Ms. Barrett called Ms. Mosley for a meeting. They issued another Level One Coaching Plan and talked to Ms. Mosley about problems with the reports, adequate staffing, and Ms. Mosley's attitude.

The alleged problem with her attitude was news to Ms. Mosley. She was

never told previously of a problem with her attitude.  According to Ms. Mosley, she got along well with staff and only received complaints from them when she was unable to accommodate a request for time off.  The attitude issue, according to Ms. Denham, was that Ms. Mosley was surly toward Ms. Barrett and Ms. Denham.

During the meeting, Ms. Mosley explained that she got the numbers for the reports from payroll.  She did not create the numbers.  Ms. Mosley also explained to Ms. Denham that when there were staffing issues on the 11 p.m. to 7 a.m. shift and on weekend shifts, Ms. Mosley was not at the facility and could not control how the facility handled call-ins, overages, and shortages.  She also explained that there were many times on the 7 a.m. to 3 p.m. shift that employees would call in before Ms. Mosley arrived, and Ms. Mosley did not learn about the issue until thirty minutes after the morning shift began.  Ms. Barrett, as the Director of Nursing, was responsible for checking the daily schedules to make sure that there were no problems with the schedule.

Ms. Denham responded that she would have another meeting with Ms. Mosley, Ms. Barrett, the payroll clerk, and Virginia Richardson (who filled in for Ms. Mosley on days she was out) to reconcile the figures.  This meeting never happened.

After the February 24, 2005, Level One Coaching Plan, problems with staffing continued.  According to Ms. Denham, when Ms. Mosley gave her an

incorrect daily schedule, Ms. Denham would inform her that the ppds were wrong and explain again how to calculate the ppds.  During the five day audit conducted by the Agency of Health Care Administration in March 2005, Ms. Mosley miscalculated the ppds on the schedule.  Ms. Denham corrected the error, but if she had not the facility would have received a citation for deficiencies.  According to Ms. Mosley, any errors in these matters were not attributable to her and were the result of incorrect information from payroll.

Rather than terminating Ms. Mosley for poor job performance, Ms. Denham transferred Ms. Mosley in March 2005 to a CNA position in the Restorative CNA program.  The transfer did not change Ms. Mosley's rate of pay or benefits.

According to Ms. Mosley, Ms. Denham targeted her for termination by transferring her to a position that she could not perform due to her lifting restriction.  The same week of her transfer, Ms. Mosley brought Ms. Denham a prescription from her doctor, Dr. Mauro, stating that she has a lifting restriction of 35 pounds and that she was restricted to light-medium work.  Ms. Denham did not accept the prescription and required Ms. Mosley to go to her doctor to get another statement.  In the meantime, Ms. Denham did not return Ms. Mosley to the Staffing Coordinator position or place Ms. Mosley in another clerical position.

After approximately one week, Ms. Denham placed Ms. Mosley in a temporary light duty CNA position.  On April 22, 2005, Ms. Mosley gave Ms.

CASE NO.: 4:06cv366-SPM/WCS

Barrett letter from her primary care doctor, Dr. Thompson, which stated that her 35 pound lifting restriction still applied. When Ms. Denham received the letter, she advised Ms. Mosley that she could not continue working at Capital unless the restriction was removed.

Ms. Mosley returned to Dr. Thompson. Dr. Thompson wrote another letter to Capital dated May 11, 2005, advising that Ms. Mosley's restrictions were still in place unless and until another assessment was paid for by workers compensation. Capital would not pay for the assessment.

Ms. Mosley called Patient's First to inquire about a workers compensation evaluation. She was told that her employer had to call about an assessment. When Ms. Mosley told Ms. Barrett, Ms. Barrett told Ms. Mosley that because she was injured while working for Beverly, Capital would not pay for the assessment. Nevertheless, Ms. Mosley still needed another assessment to have her restriction removed.

Ms. Mosley could not afford the assessment. She returned again to Dr. Thompson. On June 16, 2005, Dr. Thompson wrote another letter stating that Ms. Mosley's restrictions were still in place unless workers compensation will cover another assessment.

On June 21, 2005, Capital fired Ms. Mosley. At the time she was fired, Ms. Mosley was physically able to perform the Staffing Coordinator position. There were also other clerical positions that Ms. Mosley could have performed,

CASE NO.: 4:06cv366-SPM/WCS

such as Receptionist, Dietary Aid, and Unit Secretary.  Capital did not offer these positions to Ms. Mosley.  Nor did Capital extend to Ms. Mosley an opportunity to continue working as a CNA with duties modified to exclude lifting.  Capital's reason is that such accommodations are made only for employees who are injured while working for Capital, and Ms. Mosley was injured while working for Beverly.

To replace Ms. Mosley in the Staffing Coordinator position, Ms. Denham hired Shirley Fennell in March 2005.  Ms. Denham had a prior working relationship with Ms. Fennell and Ms. Denham was confident that Ms. Fennell would perform well.  Ms. Fennell is Caucasian and, although she had no prior experience in the position, was hired at a pay rate of $14.00 per hour (Ms. Mosley was paid $10.48 per hour).  Ms. Fennell was also given a private office, which Ms. Mosley never had.

Ms. Fennell had difficulties with the job.  On June 6, 2005, Ms. Denham and Ms. Barrett issued a coaching plan to Ms. Fennell for failure to maintain accurate records and documentation, and having a poor attitude.  Ms. Fennell voluntarily resigned on July 20, 2005, effective August 5, 2005.  She was rehired on September 29, 2005, but voluntarily resigned again in December 2005.

Flora Paris replaced Ms. Fennell as Staffing Coordinator in December 2005.  Ms. Parris is African-American.

Ms. Mosley is suing Captial for discriminating against her based on race

and disability.  Capital seeks summary judgment and contends that Ms. Mosley cannot meet the elements of a *prima facie* case for race and disability discrimination.  Capital also contends that it had legitimate, non-discriminatory reasons for removing Ms. Mosley from the Staffing Coordinator position and that Ms. Mosley could not perform the lifting requirements for the CNA position.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  An issue is "material" if it might affect the outcome of the case under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Id.

The burden is on the moving party to show that there are no genuine issues of material fact to be determined at trial.  Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)).  One way to meet the burden is by showing that the non-moving party lacks evidence to support an essential element of the non-moving party's case.  Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996).  In determining whether this burden has been met, the court views the evidence and

all factual inferences in the light most favorable to the party opposing the motion, and resolves all reasonable doubts about the facts in favor of the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citing Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

If the moving party has satisfied its burden, the burden shifts to the nonmoving party who must show "that summary judgment would be inappropriate because there exists a material issue of fact."  Mullins, 228 F.3d at 1313.  The burden can be met by presenting enough evidence to show that a reasonable finder of fact could find for the nonmoving party.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The nonmoving party must present more than a scintilla of evidence in support of its position.  Anderson, 477 U.S. at 254.  The basic inquiry by the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251.

### III. McDONNELL DOUGLAS FRAMEWORK

Because Ms. Mosley does not have any direct evidence of discrimination, to prove her case she must rely upon the indirect method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, to establish a *prima facie* case for disparate treatment because of race, Ms. Mosley must show that (1) she belongs to a protected class, (2) she was qualified for the job, (3) her employer treated similarly situated

employees outside her of class more favorably; and (4) she suffered an adverse job action.  Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).  To establish a *prima facie* case for disability discrimination, Ms. Mosley must show that (1) she has a disability or was regarded as having a disability or had a record of having a disability; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination as the result of her disability.  D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir. 2005).

If Ms. Mosley meets her burden, then a legal presumption of discrimination arises and the burden shifts to Capital to articulate a legitimate, non-discriminatory reason for the challenged actions.  Chapman, 229 F.3d 1012, 1024 (11th Cir. 2000).  Upon the proffer by Capital of a legitimate, non-discriminatory reason, the legal presumption of discrimination disappears and the burden shifts back to Ms. Mosley.  Id.  Ms. Mosley must then present evidence sufficient to show that there are genuine issues of material fact as to the truth or falsity of Capital's proffered legitimate, non-discriminatory reasons and whether Defendant unlawfully discriminated against her.  Id. at 1025 n.11.

### IV.   APPLICATION

#### A.   Race Discrimination

Capital contends that it is entitled to summary judgment on Ms. Mosley's race discrimination claim because she cannot meet two elements of her *prima facie* case; specifically that Capital treated similarly-situated employees

CASE NO.: 4:06cv366-SPM/WCS

differently and that Ms. Mosley suffered an adverse job action.

With regard to the adverse job action, ordinarily a transfer from one position to another that does not cause a loss in pay or benefits does not qualify as an adverse job action.  Davis v. Toan of Lake Park, Fla. 245 F.3d 1232 (11th Cir. 2001); Maniccia v. Brown, 171 F.3d 1362, 1370 n.3 (11th Cir. 1999).  Ms. Mosley's transfer from Staffing Coordinator to Restorative CNA did not result in a loss of pay or benefits.  This case is unusual, however, because Capital actually terminated Ms. Mosley shortly after the transfer.

According to Ms. Mosley, Ms. Denham was aware when she assigned Ms. Mosley to the Restorative CNA position that Ms. Mosley would not be able to take the position because of her lifting restriction.  The restriction was generally known among other employees in the facility.  The restriction was observable by Ms. Denham because when Ms. Mosley filled in as a CNA on an as-needed basis, she did not lift patients or engage in other lifting over 35 pounds.  From this record, there is sufficient circumstantial evidence from which a jury could find that Ms. Denham knew of Ms. Mosley's lifting restriction and placed Ms. Mosley in the Restorative CNA position to set up Ms. Mosley for termination.

Termination is a adverse job action.  Stavropoulos v. Firestone, 361 F.3d 610, 617 (11th Cir. 2004).  Accordingly, because the evidence is sufficient for a jury to find that Ms. Mosley was transferred to the Restorative CNA position with the intent that she would be terminated for being unable to perform the functions

of that position, Ms. Mosley can show that she suffered an adverse job action. Accordingly, summary judgment as to this ground will be denied.

With regard to Capital's treatment of similarly-situated employees, Ms. Mosley cannot establish a *prima facie* case.  This is because in the disciplinary context, Ms. Mosley must show that Capital disciplined in a different way another employee who engaged in the same or similar conduct.  Burke-Fowler, 447 F.3d at 1323.  "[T]he quality and quantity of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Id. quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

Ms. Mosley compares her problems with the Staffing Coordinator position with the problems that her replacement Ms. Fennell had.  Ms. Fennell was issued a coaching plan, like Ms. Mosley.  Ms. Fennell, however, only worked for Capital for a period of nine months and the record is unclear whether Ms. Fennell's problems continued after the first coaching plan.

In contrast, staffing issues with Ms. Mosley dated back to November 2004, and possibly further back, when Mr. Kovary and Ms. Boyd were fired. Whether Ms. Mosley was to blame for the problems or not, it was something that Ms. Mosley was unable to resolve despite the lengthy experience she had in the position.   This is a material difference between Ms. Mosley and Ms. Fennell that makes them inadequate comparators to show discriminatory discipline.

Ms. Mosley is unable to show any comparators who received more favorable treatment, as required to state a *prima facie* case for discriminatory discipline. Accordingly, Capital is entitled to summary judgment on this ground.

**B.     Disability Discrimination**

Capital contends that it is entitled to summary judgment on Ms. Mosley's disability discrimination claim because Ms. Mosley was not disabled and Ms. Mosley could not perform the essential functions of the Restorative CNA position with or without a reasonable accommodation. Capital also contends that Ms. Mosley has no evidence that she was discriminated against as a result of her disability.

Not every physical or mental restriction is a disability within the meaning of the law. The Americans with Disabilities Act definition of "disability" contains two parts–"[1] a physical or mental impairment that [2] substantially limits one or more of the major life activities of such individual." 42 U.S.C. §12102(2). Ms. Mosley does not claim to be disabled under this definition. She contends, rather, that Capital regarded her as being disabled.

This argument is difficult to understand because the only impairment at issue is the 35 pound lifting restriction. There were no other limitations in addition to lifting 35 pounds that Capital regarded Ms. Mosley as having. Thus the 35 pound lifting restriction either constitutes a disability or it does not. And Ms. Mosley concedes that it does not. Accord, Hilburn v. Murata Electronics

N.A., 181 F.3d 1220, 1228 (11th Cir. 1999) (ten pond lifting restriction did not establish substantial limitation of major life activity of working).  Because Capital did not regard Ms. Mosley as having any additional limitations, no additional analysis is needed.

In any event, to prevail under a regarded as theory, Ms. Mosley must show that Capital perceived that the 35 pound lifting restriction involved a major life activity and that it was substantially limiting and significant.  Rossbach v. City of Miami, 371 F.3d 1354, 1360 (11th Cir. 2004).  Ms. Mosley contends that Capital perceived that the 35 pound lifting restriction involved the major life activity of "working" and that it was substantially limiting and significant.

The record shows, however, that the work limitation Capital perceived Ms. Mosley to have was specific to the job of CNA.  The inability to work "one type of job, a specialized job, or a particular job choice" is not the same as being substantially limited in the major life activity of working.  Rossbach, 371 F.3d at 1360.  To be substantially limited in the major life activity of working, the impairment must preclude performance of a broad range of jobs.  Preclusion for particular jobs such as piloting an airplane and being a police officer is too narrow to substantially limit the life activity of working.  Id. at 1361.  Likewise, preclusion from being a CNA at a facility where CNAs are required to lift patients is too narrow.  A 35 pound lifting restriction does not substantially limit the major life activity of working.  Hilburn, 181 F.3d at 1228.  Capital is entitled to judgment

as a matter of law on this claim.

In addition, Ms. Mosley's disability discrimination claim must fail because Ms. Mosley was not qualified to be a Restorative CNA because she could not lift over 35 pounds. Ms. Mosley does not argue that she could meet this job qualification. To the contrary, she insists that she cannot.

Finally, Ms. Mosley has no evidence to suggest that Capital discriminated against her as a result of her disability. Instead, the crux of her claim is that she was discriminated against because of her race and that Capital transferred her to the Restorative CNA position, which she could not physically perform, to set her up for termination. Ms. Mosley was not disabled under the law, nor was she discriminated against for any perceived disability.

## V.   CONCLUSION

Ms. Mosley's race discrimination claim fails as a matter of law because she cannot come forward with a nearly identical comparator to show that Capital treated similarly situated employees outside of her protected class more favorably. Ms. Mosley's disability discrimination claim fails as a matter of law because she is not disabled, nor did Capital regard her as being disabled, within the meaning of the Americans with Disabilities Act. Furthermore, Ms. Mosley could not perform the essential functions of a Restorative CNA because of her lifting restriction. Accordingly, it is

ORDERED AND ADJUDGED that Defendant's motion for summary

judgment (doc. 33) is granted.   The clerk shall enter judgment accordingly.

DONE AND ORDERED this 31st day of March, 2008.

*s/ Stephan P. Mickle*
Stephan P. Mickle
United States District Judge